**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| OS-NEW HORIZON PERSONAL COMPUTING SOLUTIONS, LTD., | § | |
| Plaintiff, | § | |
| v. | § | CASE NO. 2:24-CV-00634-JRG-RSP |
| SAMSUNG ELECTRONICS CO., LTD., and SAMSUNG ELECTRONICS AMERICA, INC., | § | |
| Defendants. | § | |

**CLAIM CONSTRUCTION ORDER**

In this patent case, OS-New Horizon Personal Computing Solutions, Ltd., (OSNH) alleges infringement by Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc., (together, "Samsung") of claims from U.S. Patent 8,401,875. The patent, entitled "Secured Personal Data Handling and Management System," relates generally to providing solutions for users "to get access, store and manage their personal data in a safe and secured way, by using a personal data authenticator functioning as a smart and advanced [and easy-to-carry] token, to get a safe and highly secured access to the system and to store updated vast amount of their personal data." '875 Patent at [54], 1:27–32.

The parties' briefing raises six claim construction disputes, all of which relate to Claim 1. Having considered that briefing, along with arguments of counsel at a December 11, 2025 hearing, the Court resolves those disputes as follows.

## I. BACKGROUND

The patent identifies "a need to improve and enhance the access control capabilities to first securely and efficiently authenticate [a] specific user before giving this user access to sensitive personal data files." '875 Patent at 4:28–31. Ideally, after the user is "authenticated in a very high level of security and reliability," the user could "safely and securely communicate and exchange the user's personal secured data with other specific authenticated and pre-approved users," like medical service providers. *Id.* at 4:31–37.

To that end, "the core of the present invention is an advanced and highly reliable new generation of physical safe entry and secured access support tokens, in the shape of a small palm size, hand held apparatus, geared to serve and support the user's secured entry needs to modern computerized systems." *Id.* at 6:40–44. The apparatus "has an integrated highly secured personal data communication and management capability, combined with a built-in multi-level user's bio parameters measurement and authentication module." *Id.* at 6:44–48. The invention "fully supports the user's needs for secured data communication capability, to and from a very large data storage capacity, solid state memory module, which is an integral part and is resident within the invention apparatus." *Id.* at 6:48–52.

Figures 3A–3B (below) show a front and rear view of an embodiment, which includes a magnetic card (210) that can be concealed within the body of the device but can extend from the housing for easy interfacing with magnetic card readers. '875 Patent at 24:25–35. The embodiment also includes a camera aperture (260) for high-quality still pictures of the user's face, which the embodiment processes into a set of parameters related to the user's face structure. *Id.* at 24:57–63. Similarly, the embodiment includes an aperture (265) for an electro-optical sensor that takes high-quality images of the user's iris, which the embodiment processes into a set of parameters. *Id.* at

24:51–63. Other embodiments might include different sensor types, like an imaging sensor, a fingerprint scanning and analysis sensor, or a 3D holographic or laser scanning imaging sensor. *Id.* As shown in Figure 3B, the embodiment also includes a biosensor (250), such as a body-temperature sensor, a body pulse-rate sensor, an oxygen-saturation level sensor, an electrodermal activity sensor, or a respiration sensor. *Id.* at 25:64–26:7.



FIG.3A FIG.3B

Each of the disputed terms appears in Claim 1, which recites:

> 1. Apparatus for storing and managing personal and secured data and documentation files associated with a specific user, comprising:
>
> a plurality of biometric sensors for reading a plurality of personal biological biometric identification parameters of the user holding the apparatus, said plurality of biometric sensors being integrated within the apparatus;
>
> at least one **life signs detector** integrated within the apparatus, said life signs detector being **configured to** measure and record at least one of said user's **life sign parameters**;
>
> a first storage unit for the storage of said user's data and documentation files;
>
> an **authentication unit** comprising a second storage unit, with said second storage unit **configured to** store a pre-recorded set of personal biological biometric identification

> parameters uniquely associated with the specific user, wherein said authentication unit is **configured to** compare the plurality of personal biological biometric identification parameters of the user holding the apparatus with the pre-recorded set of personal biological biometric identification parameters stored in said second storage unit;
>
> a processor in communication with said plurality of biometric sensors, said first storage unit and **said authentication unit**;
>
> **wherein access to the personal data and documentation files stored in said first storage unit is only enabled after said authentication unit positively matches each of the plurality of personal biological biometric identification parameters** of the user holding the apparatus with the pre-recorded set of personal biological identification parameters stored in said second storage unit; and
>
> wherein, whenever any of said at least one **life signs detector** detects a **critical level** of said user measured **life sign parameters**, the apparatus is **configured to** prevent access to said user's personal data and documentation files stored in said first storage unit.

'875 Patent at 34:19–56 (disputed terms in bold). At the hearing, the parties agreed to constructions for "life signs detector," "configured to," and "authentication unit." Hr'g Tr., Dkt. No. 88 at 5:10–13. They still dispute the scope of "critical level," "life sign parameters," and the first "wherein" clause.

## II. LEGAL STANDARDS

### A. Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J.,

concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "claim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "there is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed.

Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B. Means-Plus-Function Claiming

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112 ¶ 6 (pre-AIA); *Williamson v. Citrix Online*, *LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (*en banc* in relevant portion). Under 35 U.S.C. § 112 ¶ 6, a structure may be claimed as a "means . . . for performing a specified function," and an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). When it applies, § 112 ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347.

But § 112 ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112 ¶ 6 applies when the claim language includes "means for" or "step for" terms, and a rebuttable presumption it does *not* apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. These presumptions stand or fall according to whether one of ordinary skill in the art would understand the claim with the functional language to denote sufficiently definite structure or acts for performing the function in the context of the entire specification. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir.

2015) (noting § 112 ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Masco Corp.*, 303 F.3d at 1326 (noting § 112 ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Commc'ns, LLC v. I.T.C.*, 161 F.3d 696, 704 (Fed. Cir. 1998) (noting § 112 ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means'" (quotation marks and citation omitted)).

Construing a means-plus-function limitation involves multiple steps. Step 1 "is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Step 2 "is to determine the corresponding structure described in the specification and equivalents thereof. Structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (citations and quotations omitted). The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). But § 112 ¶ 6 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

"Structure can be recited in various ways, including [by using] 'a claim term with a structural definition that is either provided in the specification or generally known in the art,' or a description of the claim limitation's operation and 'how the function is achieved in the context of the invention.'" *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) (quoting *Apple Inc.*

*v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2005)). For § 112 ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the specification must usually include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). In that case, the corresponding structure is not a general-purpose computer but rather the special-purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### C. Indefiniteness

"A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc*., 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 909.

"Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). And in the context of § 112 ¶ 6, "[t]he party alleging that the specification fails to disclose sufficient corresponding structure must make that showing by clear and convincing evidence." *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1349 (Fed. Cir. 2013) (quoting *Budde v. Harley-Davidson, Inc*., 250 F.3d 1369, 1380–81 (Fed. Cir. 2001)).

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of,

and solutions to, problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "a person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, neither party proffers a proposed level of ordinary skill in the art in its briefing. OSNH's expert, however, says a skilled artisan on the effective filing date "would have had a bachelor's degree in electrical engineering, computer engineering, computer science, biomedical engineering, or a related field, and three years of experience in the research, design, or development of biometric data security." Bavarian Decl., Dkt. No. 69-1 ¶ 24. Samsung's expert offers a similar characterization. *See* Jones Decl., Dkt. No. 74-1 ¶ 31 (opining a skilled artisan would have had "a bachelor's degree in electrical engineering, computer engineering, or a similar field, together with at least two years of practical experience in the research, design, or development of data security"). Neither party, however, argues the proper construction of the disputed terms requires resolving the differences, if any, between these skill levels.

## IV. THE DISPUTED TERMS

### A. "critical level"

| OSNH's Construction | Samsung's Construction |
|---|---|
| "value exceeding an acceptable threshold" | Indefinite. Alternatively, "a level of said user's measured life sign parameters indicating a medical emergency" |

The last limitation of Claim 1 recites that "whenever any of said at least one life signs detector detects a *critical level of said user measured life sign parameters*, the apparatus is configured to prevent access to said user's personal data and documentation files stored in [a] first storage unit." '875 Patent at 39:52–56 (emphasis added). Samsung says "critical level" is indefinite

because it's inherently subjective and the specification provides no guidance as to its bounds. Dkt. No. 74 at 2–4. Alternatively, Samsung links "critical level" to a medical emergency, noting in some dependent claims this term triggers an emergency call and transmission of data to emergency centers. *Id.* at 5–7.

OSNH, however, says the term only concerns deviation from a threshold. Dkt. No. 69 at 7–9. In its view, the specification ties the resulting action of exceeding the critical level to security thresholds due to distress caused by coercion rather than some negative health event. *Id.* at 8. According to OSNH, Samsung's construction reads out those embodiments. *Id.* (citing '875 Patent at 3:60–4:6, 18:22–26, 25:64–26:7).

The Court agrees with Samsung's alternative construction. Other than the claims, the patent uses "critical level" only once:

> In another embodiment of the present invention apparatus, whenever any of the group of life sign indicators detects a *critical level*, the apparatus is configured to initiate an emergency call to any of a group of registered emergency centers, and send to the registered emergency centers any of a group of data files containing information associated with the user, including the identification data file of the user, personal medical data file of the user, the measured set of life sign parameters of the user and location of the user.

'875 Patent at 10:54–62. Notably, the claims as filed used "critical level" in dependent Claim 5, but *not* Claim 1. '875 Patent File History, Dkt. No. 74-3 at 9–10 (reciting, in original Claim 5, that "whenever any of the group of life sign indicators detects a critical level, the apparatus is configured to initiate an emergency call to any of a group of registered emergency centers"). During prosecution, however, the applicant amended Claim 1 to recite "critical level." Moreover, in the medical context, "critical" has a meaning that connotes something more than simply "abnormal" or "under duress." Jones Decl., Dkt. No. 74-1 ¶ 97 (quoting *critical*, Am. Heritage Med. Dictionary

(2007) ("of or relating to a medical crisis" or "being or relating to a grave physical condition especially of a patient")).

OSNH's position is not persuasive. Although it says Samsung's construction reads out other embodiments, "the claims . . . need not encompass all disclosed embodiments." *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008). Nor has OSNH presented a viable alternative "ordinary" meaning of "critical" that would cover those embodiments. Finally, that the applicants opted to narrow Claim 1 during prosecution to include a reference to "critical level," which at the time was only used in connection with medical emergencies, undercuts OSNH's position that the term had some broader meaning on the filing date.

In its reply, OSNH says only its construction "*maintains* consistency across the different applications described in Claims 1, 22, and 23." Dkt. No. 76 at 3. But Claims 22–23 don't recite "critical level." *See* '875 Patent at 42:12–60. OSNH's position seems to be that a term used in one independent claim must be construed to cover the same subject matter of other claims in which the term is *not* used. That, of course, is not a recognized canon of construction and would undercut the notion that "the name of the game is the claim." *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998). Moreover, OSNH's construction raises indefiniteness concerns by failing to provide objective boundaries for determining infringement, because the "acceptable threshold" would likely vary greatly on a user-by-user basis.

Effectively, OSNH relies on a "totality of the specification" approach to construe the claim as a whole to cover the disclosed subject matter, *see, e.g.*, Hr'g Tr., Dkt. No. 88 at 9:15–18, 10:11–17 (suggesting the Court "look at the specification as a whole [to] see these other embodiments that discuss how this technology can be applied"), rather than construe the disputed term in light of the specification. Here, because both the Summary and claims use "critical level" in the medical

context, the Court adopts Samsung's construction of "a level of said user's measured life sign parameters indicating a medical emergency."

### B. "life signs detector"

| OSNH's Construction | Samsung's Construction |
|---|---|
| "a detector for life signs, which can also be a biometric sensor with algorithms configured for such detection" | Plain and ordinary, no construction necessary. Alternatively, "a detector integrated within the apparatus that is configured to measure and record at least one of said user's life sign parameters" |

Claim 1 recites:

> at least one **life signs detector** integrated within the apparatus, said **life signs detector** being configured to measure and record at least one of said user's life sign parameters;
>
> . . .
>
> whenever any of said at least one **life signs detector** detects a critical level of said user measured life sign parameters, the apparatus is configured to prevent access to said user's personal data and documentation files stored in said first storage unit.

'875 Patent at 39:26–56 (emphasis added).

In their briefing, the parties disputed whether a "life signs detector" includes "a biometric sensor with algorithms configured for such detection." At the hearing, however, the parties agreed to the Court's preliminary construction of "plain and ordinary meaning," Hr'g Tr., Dkt. No. 88 at 5:10–13. The Court adopts that construction.

### C. "life sign parameters"

| OSNH's Construction | Samsung's Construction |
|---|---|
| "characteristics indicative of whether the user is alive, injured, or distressed" | "characteristics indicative of a user's health condition" |

Claim 1 recites:

> at least one life signs detector integrated within the apparatus, said life signs detector being configured to measure and record at least one of said user's **life sign parameters**;
>
> . . .
>
> whenever any of said at least one life signs detector detects a critical level of said user measured **life sign parameters**, the apparatus is configured to prevent access to said user's personal data and documentation files stored in said first storage unit.

'875 Patent at 39:26–56.

The parties dispute what "life sign parameters" are. Calling Samsung's construction too narrow, OSNH focuses on the patent's description of "security-driven liveness and distress detection." Dkt. No. 69 at 16 (quoting '875 Patent at 3:60–4:6, 25:64–67). This, says OSNH, shows the invention requires liveness detection to prevent spoofing, whereas Samsung's construction wrongly narrows the term to health-monitoring and thus ignores the patent's purpose. *Id.* at 17–18. In response, Samsung notes "life signs parameters" appears only three times in the specification and always refers to physiological characteristics. Dkt. No. 74 at 11 ('875 Patent at 10:42–62).

The Court generally agrees with Samsung. The specification describes a "biological life sign detection and measurement dedicated optical sensor" that measures the pulse rate and oxygen content of the user's blood. '875 Patent at 18:22–27. Based on those measurements, the embodiment determines whether the user is in a stress state and perhaps stops the authentication process.

’875 Patent at 18:22–27. This clearly ties the measured parameters to the user’s physical characteristics. The invention does not, as OSNH suggests, simply determine whether the user is alive, injured, or distressed.

OSNH says the patentee intended a broader security and anti-spoofing focus, which Samsung ignores. Dkt. No. 69 at 16–18. But even if the patentee intended a broader security focus, that intent is irrelevant to how a skilled artisan would understand the ordinary meaning of the claim language.[1] And even if a claim is not aligned with the recited purpose of an invention, that is not a license to rewrite the meaning of claim language’s otherwise ordinary meaning. Accordingly, the Court construes this term as “physiological characteristics indicative of a user’s health condition.”

**D. “configured to”**

| OSNH’s Construction | Samsung’s Construction |
| --- | --- |
| Plain and ordinary meaning, which means “designed to” | Plain and ordinary meaning, no construction necessary. But if the Court requires construction, “capable of performing the function without modification.” |

“Configured to” appears four times in Claim 1:

> at least one life signs detector integrated within the apparatus, said life signs detector being **configured to** measure and record at least one of said user's life sign parameters;
>
> a first storage unit for the storage of said user’s data and documentation files;
>
> an authentication unit comprising a second storage unit, with said

[1] Of course, an applicant’s intent is very relevant when determining whether he has deviated from that ordinary meaning. *See Thorner v. Sony Comput. Entm’t Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (noting “the patentee must ‘clearly express an intent’ to redefine the term” and “[t]he standard for disavowal of claim scope is similarly exacting” (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).

> second storage unit **configured to** store a pre-recorded set of personal biological biometric identification parameters uniquely associated with the specific user, wherein said authentication unit is **configured to** compare the plurality of personal biological biometric identification parameters of the user holding the apparatus with the pre-recorded set of personal biological biometric identification parameters stored in said second storage unit;
>
> . . . ;
>
> wherein, whenever any of said at least one life signs detector detects a critical level of said user measured life sign parameters, the apparatus is **configured to** prevent access to said user's personal data and documentation files stored in said first storage unit.

’875 Patent at 39:26–56 (emphasis added).

In their briefing, the parties’ dispute centers on whether “user activation” amounts to “configuration.” OSNH, for example, says “‘configured to’ means ‘designed to’ or equipped for a function, *even if user activation is required to use the infringing functionality*.” Dkt. No. 69 at 19 (emphasis added). It accuses Samsung’s construction as “invit[ing] confusion, as ‘modification’ could be misinterpreted to include activation steps (e.g., user provided biometrics like fingerprints), contrary to precedent concerning apparatus claims.” *Id.* at 19–20. Samsung, however, says “without modification” means without “structural changes to the device itself, such as altering source code or enabling previously disabled features.” Dkt. No. 74 at 16. In its view, “simply activating existing functionality” would not be “modification.” *Id.* OSNH appears to agree. *See* Dkt. No. 76 at 7 (emphasizing Samsung’s “concession” that “‘modification’ refers to structural changes to the device itself . . . not to a user simply activating existing functionality” (quoting Dkt. No. 74 at 16)).

That apparent agreement continued at the hearing, at which the parties agreed to a “plain and ordinary meaning” construction for this term. Hr’g Tr., Dkt. No. 88 at 5:10–13. The Court

adopts that construction.

### E. "wherein access . . . is only enabled after said authentication unit positively matches each of the plurality of personal biological biometric identification parameters"

| OSNH's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning, which is "access is simply enabled upon the authentication unit positively matching each of multiple personal biological biometric identification parameters" | Plain and ordinary meaning, which is "access is solely enabled after said authentication unit positively matches two or more distinct personal biological biometric identification parameters" |

Claim 1 recites:

> a plurality of biometric sensors for reading a plurality of personal biological biometric identification parameters of the user holding the apparatus . . . ;
>
> **wherein access** to the personal data and documentation files stored in said first storage unit **is only enabled after said authentication unit positively matches each of the plurality of personal biological biometric identification parameters** of the user holding the apparatus with the pre-recorded set of personal biological identification parameters stored in said second storage unit[.]

'875 Patent at 39:22–51 (emphasis added). The parties' briefing reflects two disputes about this phrase: (1) "whether the authentication unit must positively match each of the plurality of parameters before permitting a user access, as [required by] Samsung's proposed construction, or whether, as OSNH proposes, access may [also] be granted through alternative methods," and (2) "whether the 'plurality of . . . parameters' must be distinct biometric identifiers, or could be duplicative measurements of the same parameter." Dkt. No. 69 at 17–18.

1. *Whether the "authentication unit" must positively match each of the plurality of parameters before permitting a user access, or whether access may be granted through alternative methods in addition to the requirements of Claim 1*

Samsung frames the first dispute as "whether the authentication unit must positively match each of the plurality of parameters before permitting a user access . . . or whether . . . access may be [also] granted through alternative methods." Dkt. No. 74 at 17–18. OSNH says its construction "clarifies that the claim does not preclude devices that also include some additional forms of authentication, such as pin codes, that do not require biometric matching." Dkt. No. 76 at 9. Samsung, however, reads "only" as "exclusively," which it says is consistent with how the applicants distinguished the invention during prosecution. Dkt. No. 74 at 18.

The hearing helped clarify the dispute. Samsung agrees that "in addition to the security features and so on described in Claim 1 of the patent, that a password might also be required." Hr'g Tr., Dkt. No. 88 at 49:22–25. Its position is that "a password alone would not . . . enable access to [the] files." *Id.* at 50:5–7. In contrast, OSNH asserts that "if the device can also be accessed by a password, that doesn't preclude infringement." *Id.* at 52:17–20.

The differences in the parties' positions can be visualized in the context of a hypothetical device having two ways of accessing a user's secure files: (1) a password or PIN alone, and (2) the biometric matching of Claim 1, either alone or with additional security measures. According to OSNH, that a user of such a device could access the files just with a password does not exclude the device from Claim 1 as long as the user could also access the files using the biometric matching, but Samsung says otherwise. The parties agree, however, that the device must have the recited biometric-matching capability.

The Court agrees with OSNH. Asserting its construction is "consistent with the

specification," Samsung notes the patent's disclosure that, "due to the sensitivity of the medical records, the access to them should be highly secured and a simple password or even one biometric access permit . . . is not enough." Dkt. No. 74 at 19. The patent, says Samsung, solves this problem "by using multi-modal biometric authentication, describing the 'core of the present invention' as an apparatus including a "bio parameters measurement and authentication module" and "the present invention" as having a "set of at least two bio sensors" for "providing highly reliable and safe authentication capability, based on the processing of user's measured set of biological parameters." *Id*. (quoting '875 Patent at 6:40–63). In the preferred embodiment, access "is only enabled after positive authentication of the user's personal biological identification parameters by the authentication unit." '875 Patent at 10:39–41; *see also id.* at 19:11–14 ("Positive authentication result is only achieved when positive results are derived from at least three biological parameters measuring sensors 124, 126, 128[.]"). But none of these excerpts necessarily excludes other types of authentication from also being implemented in the same device. More importantly, nor does the open-ended nature of the claim.

Samsung also cites the prosecution history for support. Specifically, Samsung points to arguments surrounding a rejection based on U.S. Publication No. 2009/0062887 (Mass). Dkt. No. 74 at 19–20. During prosecution, the examiner cited Para. [0021] of Mass as disclosing the limitation. Mass explains:

> One authentication mechanism that may be used [t]o pair the PIMD and the PPC is the "challenge/response" approach. A PIMD or PPC wanting to authenticate another device creates a random challenge message and sends it to that device. The device receiving the challenge message adds a time stamp and signs it with a private key (from a public/private key pair). The signed response is returned to the challenger, who can check it with the public key. If it passes, and the time stamp is "recent," then the challenger knows that the other device really has the private key. As long as keys are secured, the receiver has to be the authentic owner of that

> public/private key pair. Authentication can also be performed with symmetric keys, if a means is provided to ensure that the same key is in both systems in a secure manner, but a public key infrastructure **(**PKI**)** may be preferred for some applications.

Dkt. No. 74-3 at 44–45 (quoting U.S. Publication No. 2009/0062887 ¶ [0021]). The applicants characterized this paragraph as "refer[ring] to the pairing of two devices," and then argued both that (1) Mass fails to disclose the limitation of "a plurality of biometric sensors . . . integrated with the apparatus," and (2) Mass doesn't compare the identification parameters with the pre-recorded set of identification parameters stored in the apparatus. *Id.* Notably, the applicants' argument was not that Mass disclosed *other* authentication methods *in addition to* comparing biological identification parameters, but that there was no comparison of biological identification parameters *at all*. That's not prosecution history that requires the interpretation now urged by Samsung.

While it may be true that, as set forth in the specification, *preferred* embodiments *only* provide the option of accessing the user data through biometric matching, the Court finds nothing that requires reading the open-ended claim language so narrowly as to exclude less preferred embodiments that provide other authentication methods. For that reason, the Court adopts OSNH's position.

2. *Whether the "plurality of . . . parameters" must be distinct biometric identifiers, or could be duplicative measurements of the same parameter.*

In this second dispute, Samsung questions "what makes up the 'plurality of . . . parameters." Dkt. No. 74 at 21. According to Samsung, "the parameters must be 'distinct'—*i.e.*, separate and individual parameters derived from separate and individual sensors." *Id.* For support, Samsung points to the patent's purported criticism of the prior art, and says its "reference to separate sensors measuring distinct parameters show the 'plurality' is not satisfied by taking duplicative readings of the same parameter." *Id.* at 22. Samsung also asserts the applicants distinguished prior-art

references based on the invention's requirement of "multiple, distinct biometric identifiers." *Id.* OSNH replies that nothing in the record amounts to clear and unambiguous disavowal. Dkt. No. 76 at 9.

The Court agrees with Samsung. The claim does not recite a "plurality of *measurements*," but a "plurality of *parameters*." The patent, for example, discloses the parameters of a user's heart pulse and oxygen content in the user's blood. *See* '875 Patent at 18:7–37. Two separate instruments that each measure a user's heart pulse does not qualify as two "parameters," but rather as two "measurements." In other words, the "plurality" is not satisfied by taking duplicative readings of the same parameters.

Having clarified the scope of the phrase for the parties, the Court will give this phrase as a whole a "plain and ordinary meaning" construction. Attempting to provide a further construction would result in greater juror confusion than clarification.

### F. "authentication unit"

| OSNH's Construction | Samsung's Construction |
|---|---|
| Plain and ordinary meaning, which is "a component for verification."<br>Alternatively, should the Court determine this term is governed by § 112 ¶ 6:<br>**Function:** Configured to receive and authenticate (verify) the identity of the apparatus user by comparing a plurality of personal biological biometric identification parameters from a real, live user, as processed by the processing module, with a pre-recorded set of personal biological biometric identification parameters for an authorized user stored in the second storage unit.<br>**Structure**: Data storage and processor configured to:<br>(1) securely store in a second storage unit a pre-recorded set of personal biological biometric identification parameters;<br>(2) receive and process biometric data from the sensor module via a dedicated processing component; and<br>(3) perform a comparison to authenticate the user, confirmed as a real, live user based on life sign detection. | Subject to pre-AIA 35 U.S.C. §112 ¶ 6.<br>**Function:** Authenticating the identity of the apparatus user by comparing a plurality of personal biological biometric identification parameters of a specific user holding the apparatus with a pre-recorded set of personal biological biometric identification parameters stored in a second storage unit.<br>**Structure:** memory and processor programmed to perform the recited function. |

Claim 1 recites:

> a first storage unit for the storage of said user's data and documentation files;
>
> . . .
>
> an **authentication unit** comprising a second storage unit, with said second storage unit configured to store a pre-recorded set of personal biological biometric identification parameters uniquely associated with the specific user, wherein said **authentication unit** is configured to compare the plurality of personal biological

> biometric identification parameters of the user holding the apparatus with the pre-recorded set of personal biological biometric identification parameters stored in said second storage unit[.]

’875 Patent at 39:30–41. In their briefing, the parties disputed whether “authentication unit” is a means-plus-function term and, if it is, the corresponding structure.

*1. Whether this is a means-plus-function term*

OSNH says the term has an ordinary meaning of “component for verification.” Dkt. No. 69 at 29 (citing the specification). It points to Samsung’s IPR expert for support, who opines “authentication is a process by which a system verifies that a user is permitted access to a computer system resource such as protected data.” *Id.* (quoting Wolfe Decl., Dkt. No. 69-1 ¶ 29). It also emphasizes the presumption that § 112 ¶ 6 does not apply due to the absence of the word “means.” *Id.* at 29–30. Samsung responds that the specification only describes what the term does rather than what it is. Dkt. No. 74 at 24.

The Court agrees with Samsung. Notably, OSNH’s supposed “ordinary meaning” is itself functional, placeholder language—“component for verification.” OSNH does not establish this term would connote specific structure to a skilled artisan. At most, OSNH establishes the meaning of “authentication,” which is not in doubt. This is a means-plus-function term.

*2. The corresponding structure*

In the briefing, the parties agree the corresponding structure includes a processor and memory, but dispute whether the three steps proposed by OSNH are part of the corresponding structure. Samsung accuses OSNH of failing to support those steps, but the specification includes provides support:

(1) digitizing and processing the output of a set of sensors that measure a bio-sensed set of parameters of the holder of the apparatus, ’875 Patent at 19:6–11; and

(2) comparing the measured bio-sensed set of parameters of the apparatus's present holder, to the set of parameters, stored in a separate sub-module, *id.* at 24:45–48.

The Court holds the corresponding structure is a processor and memory, with the processor configured to perform these steps. At the hearing, the parties agreed to this structure, which the Court identified as its preliminary construction. Hr'g Tr., Dkt. No. 88 at 5:10–13.

## V. CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "critical level" | "a level of said user's measured life sign parameters indicating a medical emergency" |
| "life signs detector" | Plain and ordinary meaning |
| "life sign parameters" | "physiological characteristics indicative of a user's health condition" |
| "configured to" | Plain and ordinary meaning |
| "wherein access . . . is only enabled after said authentication unit positively matches each of the plurality of personal biological biometric identification parameters" | Plain and ordinary meaning |

| | |
|---|---|
| "authentication unit" | Subject to pre-AIA 35 U.S.C. § 112 ¶ 6<br>**Function:** authenticating the identity of the apparatus user by comparing a plurality of personal biological biometric identification parameters of a specific user holding the apparatus with a pre-recorded set of personal biological biometric identification parameters stored in a second storage unit<br>**Structure:** processor and memory, the processor configured to (1) digitize and process the output of a set of sensors that measure a bio-sensed set of parameters of the holder of the apparatus (19:6–11); and (2) compare the measured bio-sensed set of parameters of the apparatus's present holder, to the set of parameters, stored in a separate sub-module (24:45–48) |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 11th day of February, 2026.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE